118 F.3d 1531
 GOODYEAR TIRE & RUBBER COMPANY, Plaintiff-Appellant,
v.
DEPARTMENT OF ENERGY, Federico F. Pena, Secretary of Energy
and George B. Breznay, Director, Office of Hearing
and Appeals, Defendants-Appellees.
 No. 96-1389.
 United States Court of Appeals,
Federal Circuit.
 June 30, 1997.
Rehearing Denied Aug. 26, 1997.
 
 James Baller, The Baller Law Group, P.C., Washington, DC, argued, for plaintiff-appellant. With him on the brief was Lana L. Meller.
 Don W. Crockett, Office of General Counsel, United States Department of Energy, Washington, DC, argued, for defendants-appellees.
 Before NEWMAN, LOURIE and BRYSON, Circuit Judges.
 LOURIE, Circuit Judge.
 
 
 1
 The Goodyear Tire & Rubber Company (Goodyear) appeals from the summary judgment of the United States District Court for the District of Columbia, Goodyear Tire & Rubber Co. v. Department of Energy, 942 F.Supp. 629 (D.D.C.1996), holding that (1) the Department of Energy's (DOE's) Office of Hearings and Appeals (OHA) lawfully applied its newly-adopted crude oil overcharge refund eligibility rule to Goodyear's refund claims, which were filed before that rule was adopted, and (2) OHA did not err in applying that rule in denying the bulk of Goodyear's refund claims. We conclude that OHA's application of the rule was not unlawfully retroactive and that OHA properly declined to apply a broad, non-specific presumption of overcharge injury based solely on the fact that Goodyear's suppliers were affiliates of crude oil refineries. We also conclude that substantial evidence exists to support OHA's denial of a presumption with respect to certain purchases of petroleum products, but that substantial evidence is lacking for OHA's finding that Goodyear was not entitled to a presumption of overcharge injury for its purchases of two petroleum products from two of its suppliers. We therefore affirm-in-part and reverse-in-part.
 
 BACKGROUND
 
 2
 This action arises under Section 5(a)(1) of the Emergency Petroleum Allocation Act of 1973 (EPAA), 15 U.S.C. § 751-760h (1982), which incorporated § 211 of the Economic Stabilization Act (ESA), 12 U.S.C. § 1904 note (1976). These provisions had the effect of temporarily setting prices for and controlling the allocation of crude oil and refined petroleum products.[1]
 
 
 3
 In August 1973, the Cost of Living Council, acting pursuant to its authority under the ESA, issued its so-called "Phase IV" petroleum and petroleum product price regulations. See 38 Fed.Reg. 22,536 (1973) (adding 6 C.F.R. §§ 150.351-150.363). These regulations set prices for a variety of petroleum products including those described in Industry Code 2911 of the 1972 edition of the Standard Industrial Classification Manual (SICM). Of relevance to this case are the SICM Code 2911 listing for "butadiene, from petroleum"; "mineral waxes, natural"; "paraffin waxes, from petroleum refining"; and "liquified petroleum gases" including ethylene and propylene.
 
 
 4
 In November 1973, Congress enacted the EPAA, Pub.L. No. 93-159, 87 Stat. 627 (1973), which gave the President authority to regulate the price and allocation of crude oil, residual fuel oil, and "refined petroleum product." 15 U.S.C. § 753 (1983). A refined petroleum product was defined more narrowly than under the ESA as "gasoline, kerosene, distillates (including Number 2 fuel oil), [propane, butane], refined lubricating oils, or diesel fuel." 15 U.S.C. § 752(5)-(6) (1983). The relevant SICM-based "Phase IV" price control regulations established under the ESA continued in effect until they were amended during the staged decontrol of petroleum products, which began in January 1974 and continued through January 1981. See 15 U.S.C. § 755(a) (1974); H.R. Conf. Rep. No. 93-628, at 15 (1973), reprinted in 1973 U.S.C.C.A.N. 2688, 2702; see also 46 Fed.Reg. 9,909 (1981); 39 Fed.Reg. 4,129 (1974).
 
 
 5
 In 1986, in light of the court-approved settlement agreement in In re Department of Energy Stripper Well Exemption Litigation, 653 F.Supp. 108, 113 (D.Kan.1986), aff'd, 855 F.2d 865 (Temp.Emer.Ct.App.1988), which mandated, inter alia, that DOE provide special crude oil refund proceedings for parties not involved in the settlement, Congress enacted the Petroleum Overcharge Distribution and Restitution Act of 1986 (PODRA), Pub.L. No. 99-509, 100 Stat. 1881 (codified at 15 U.S.C §§ 4501-07 (1994)). See H.R.Rep. No. 99-727, at 56-59 (1986) reprinted in 1986 U.S.C.C.A.N. 3607, 3652-55. Under this legislation, OHA was authorized to identify and make restitution to parties who were injured by petroleum overcharges with funds recovered from those who violated the petroleum price control and allocation provisions of the ESA and EPAA. 15 U.S.C. § 4502(b) (1994); see also 10 C.F.R. § 205.280-205.288 (1996) (Subpart V-Special Procedures for Distribution of Refunds).
 
 
 6
 To implement this legislation, OHA initially established the following requirements for refund applications, consistent with existing practice under Subpart V:As in non-crude oil cases, applicants will be required to document their purchase volumes and demonstrate that they were injured.... Applicants who were end users (ultimate consumers) of petroleum products whose businesses are unrelated to the petroleum industry and who were not subject to the DOE price regulations are presumed to have absorbed rather than passed on alleged crude oil overcharges, and need not submit any further evidence of injury beyond volumes of product purchased in order to receive a refund. It is not necessary for applicants to identify their suppliers of petroleum products in order to receive a refund.
 
 
 7
 6 Fed. Energy Guidelines (CCH) p 90,718 (1987) (citations omitted); see also 52 Fed.Reg. 13,291 (1987); 51 Fed.Reg. 27,899 (1986). In one of its first crude oil refund decisions, OHA stated:
 
 
 8
 As a general principle, any product that was covered by the [EPAA], and that was produced from a crude oil refinery qualifies as a product that may be considered for a refund.... We will presume that any product that was regulated by the DOE at any time during the August 19, 1973 through January 27, 1981 [Stripper Well ] Settlement Period meets that standard.
 
 
 9
 Hartsville Oil Mill, 17 DOE (CCH) p 85,110, at 88,237 (1988). Thus, for so-called "end user" refund applicants (i.e., ultimate consumers of petroleum products whose businesses were unrelated to the petroleum industry and who were not subject to the DOE price regulations), OHA presumed that any product covered by the ESA, even if that product was subsequently exempted by regulations promulgated under the EPAA, was produced in a crude oil refinery. Therefore, when an end user applicant simply documented the purchase of a product regulated under either the ESA or EPAA, it would qualify for a refund.
 
 
 10
 Soon thereafter OHA was confronted with a refund claim based on the purchase of what it called an "esoteric" petroleum product, viz., "refinery fuel gas," and it was forced to reexamine its refund eligibility rule. See Montana Sulfur & Chem. Co., 20 DOE (CCH) p 85,625, at 89,417 (1990). After reexamining the rule, OHA concluded that even though refinery fuel gas was listed in SICM Industry Code 2911 and therefore was "regulated for a small portion of the price control period," the presumption articulated in Hartsville should not necessarily end OHA's inquiry. Indeed, OHA found that the 1974 EPAA-based amendments to the "Phase IV" regulations conflicted with the presumption that a purchase of refinery fuel gas was refund-eligible. Id. The preamble to these amendments stated, in relevant part, that "[c]ertain products such as ... refinery gas ... are not subject to the provisions of the [EPAA]." Id. (citing 39 Fed.Reg. 12,353 (1974)). Therefore, OHA found that refinery gas was not subject to the price regulations promulgated pursuant to the EPAA and thus that the presumption of eligibility was inapplicable. Id.
 
 
 11
 Less than two years later, DOE further indicated in the district court in Great Lakes Carbon Corp. v. Department of Energy, No. 91-22601(SS) (D.D.C. Feb. 19, 1992), remanding appeal from 20 DOE (CCH) p 85,748 (1990), that it was experiencing difficulties in applying its eligibility rule and hence had not adequately addressed refund eligibility in a number of pending cases. Pursuant to the district court's remand order, OHA initiated formal rulemaking procedures to devise a more workable and equitable eligibility rule that would faithfully implement PODRA. See 57 Fed.Reg. 19,124 (1992). After receiving comments from several parties, including Goodyear, OHA issued a revised refund eligibility rule (hereinafter, "the 1992 rule") in which the presumption stated in Hartsville was replaced. Under the 1992 rule, OHA stated:
 
 
 12
 We will presume that a claimant incurred a crude oil overcharge in the purchase of a product during the relevant period if either that product was named as a covered product in regulations promulgated pursuant to EPAA, or (a) was purchased from a crude oil refinery or (b) originated in a crude oil refinery and was purchased from a reseller who did not substantially change its form.
 
 
 13
 57 Fed.Reg. 30,731, 30,732 (1992). Accordingly, OHA would treat the purchase of all products "covered by EPAA" as eligible for a refund. Id. Alternatively, "[i]t will be the burden of the applicant to establish that a product not within the definition of covered products under the EPAA was in fact produced at a crude oil refinery," and that the product was purchased either from a crude oil refinery or from a reseller who did not substantially change the product's form. Id. Thus, an applicant would qualify for a refund based on the purchase of a non-EPAA product only if it presented a sufficient reasoned argument based on reliable, probative evidence that it purchased the product directly from a crude oil refinery or that it, not its supplier, bore the impact of an overcharge for the product (i.e., that the reseller actually passed on the overcharge to the applicant). Id.; see also City of Annapolis, 17 DOE (CCH) p 85,774, at 89,459 (1988).
 
 
 14
 This appeal involves Goodyear's crude oil and refined petroleum product refund application, which was based on purchases of more than two billion gallons of petroleum products during the ESA/EPAA control period. Goodyear's application was initially filed on December 22, 1987. In an October 7, 1991 decision addressing the consolidated claims of six refund applicants, OHA granted Goodyear's refund claims with respect to its purchases of gasoline, heating oil, and aviation fuel, but denied or deferred the bulk of its claims involving purchases of carbon black, propylene, ethylene, isoprene (also referred to by the parties as "crude oil C5 streams"), styrene, butadiene, and petroleum wax. Firestone Tire & Rubber Co., 21 DOE (CCH) p 85,396, at 89,156 (1991). In a May 18, 1994 reconsideration decision, OHA applied the 1992 rule to Goodyear's outstanding claims over Goodyear's objections. Goodyear Tire & Rubber Co., 24 DOE (CCH) p 85,039, at 88,111 (1994). OHA declined to presume that Goodyear's petroleum industry-affiliated suppliers had passed on overcharges in Goodyear's purchases of carbon black, isoprene, and styrene. See id. at 88,115 (regarding carbon black); id. at 88,118-20 (regarding isoprene); id. at 88,120-22 (regarding styrene). It also found a Goodyear employee's affidavits, submitted as evidence to prove that the propylene, isoprene, butadiene, and petroleum wax were purchased from crude oil refineries, not to be persuasive. See id. at 88,115-17 (regarding propylene); id. at 88,118-20 (regarding isoprene); id. at 88,122-24 (regarding butadiene); id. at 88,124 (regarding petroleum wax). Accordingly, OHA denied the vast majority of Goodyear's outstanding claims.
 
 
 15
 Goodyear brought suit in the district court challenging OHA's final order. On the parties' cross-motions for summary judgment, the district court ruled that OHA (1) acted within its authority in promulgating the 1992 rule, 942 F.Supp. at 632-33, (2) did not unlawfully apply the 1992 rule retroactively so as to impair any of Goodyear's vested rights, id., (3) properly applied the 1992 rule and its underlying presumptions of injury in evaluating and ultimately denying the bulk of Goodyear's refund claims, id. at 633-34, and (4) relied on substantial evidence in finding the affidavits not to be probative, id. at 634. Goodyear filed a timely appeal to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(11), (12) (1994).
 
 DISCUSSION
 
 16
 On appeal, Goodyear makes essentially the same arguments that it made before the district court. It first argues that OHA unlawfully applied the 1992 rule retroactively to Goodyear's refund claim. Goodyear also argues that OHA misapplied the 1992 rule in denying the bulk of its claims. Specifically, it argues that OHA so erred by (1) misconstruing the phrase "regulations promulgated pursuant to the EPAA" in the 1992 rule, (2) denying Goodyear the benefit of its "reasoned argument" that its suppliers had passed through overcharges, making Goodyear the actual victim of the those overcharges, and (3) discounting the Goodyear employee's affidavit asserting that the products on which Goodyear's claims were based originated in and were purchased from crude oil refineries and thus were presumptively eligible for refunds under the 1992 rule.
 
 
 17
 We have adopted the body of law represented by the holdings of the Temporary Emergency Court of Appeals as precedent in cases over which we have appellate jurisdiction pursuant to Pub.L. No. 102-572, § 102, 106 Stat. 4506, 4506-07 (1992) (amending 28 U.S.C. § 1295(a) by adding subparagraphs (11)-(14)). Texas Am. Oil Corp. v. United States Dep't of Energy, 44 F.3d 1557, 1561 (Fed.Cir.1995) (in banc). Accordingly, applying that court's case law, we review de novo the district court's summary judgment disposition of Goodyear's appeal from DOE's EPAA/ESA-based action. See MAPCO Int'l Inc. v. FERC, 993 F.2d 235, 239 (Temp.Emer.Ct.App.1993). Notwithstanding the lack of deference we must give to a district court's summary judgment determination, our review of the underlying agency action requires deference. We "will set aside an EPAA/ESA agency action only if it is in excess of the agency's authority, or is based upon findings which are not supported by substantial evidence. We recognize DOE's administrative expertise, accord the agency's determination great deference, and must approve the DOE decision if there is a rational basis for it." Phoenix Petroleum Co. v. FERC, 95 F.3d 1555, 1567 (Fed.Cir.1996). Applying these principles, we address Goodyear's arguments in turn.
 
 A. Retroactivity
 
 18
 Goodyear argues that OHA impermissibly applied the presumptions of the 1992 rule to its refund claims for all of the identified products instead of the presumptions that existed at the time its claims were filed. Goodyear asserts, and DOE readily admits, that under the pre-1992 rule, Goodyear's claims would have been presumed to qualify for refunds. Thus, Goodyear argues, OHA's application of the 1992 rule must be struck down as an impermissible retroactive application of a substantive rule, inconsistent with the Supreme Court's recent decision in Landgraf v. USI Film Products, Inc., 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). In response, DOE argues that OHA's application of the 1992 rule was not unlawful because OHA permissibly corrected its defective pre-1992 rule before denying the claims, application of the 1992 rule did not impose new duties or attach new disabilities to Goodyear's past purchases, and Goodyear had no "vested right" to have the agency apply its pre-1992 rule. We agree with DOE that OHA's application of the 1992 rule was not retroactive because it was a proper correction of a defective agency practice, Goodyear did not detrimentally rely on OHA evaluating its refund claims under the presumptions that existed prior to the 1992 rule, and Goodyear had no vested right to the application of the pre-1992 rule.
 
 
 19
 Contrary to Goodyear's argument, the Supreme Court's analysis in Landgraf supports the district court's conclusion that OHA's application of the 1992 rule to Goodyear's claim was not unlawfully retroactive. In Landgraf, the Supreme Court outlined a method to determine whether a statute may lawfully be applied retroactively. By analogy, this method may also be used to determine whether, in the absence of explicit Congressional authority to enact retroactive rules, an agency may lawfully apply a newly-issued rule to disputes that are pending before it. See DIRECTV, Inc. v. FCC, 110 F.3d 816, 825-26 (D.C.Cir.1997); cf. United States Sec. & Exch. Comm'n v. Fehn, 97 F.3d 1276, 1285-87 (9th Cir.1996) (action pending before a district court). The Landgraf Court stated that "[a] court must determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." Landgraf, 511 U.S. at 280, 114 S.Ct. at 1505. The Court also stated that applying an a newly enacted statute in pending disputes is not retroactive
 
 
 20
 merely because it is applied in a case arising from conduct antedating the statute's enactment, or upsets expectations based on prior law. Rather the court must ask whether the new provision attaches new legal consequences to events completed before its enactment. The conclusion that a particular rule operates "retroactively" comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event.... [R]etroactivity is a matter on which judges tend to have sound instincts, and familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance.
 
 
 21
 Id. at 269-70, 114 S.Ct. at 1499 (footnote, citations, and internal quotations omitted); see also Heckler v. Community Health Servs., Inc., 467 U.S. 51, 61 n. 12, 104 S.Ct. 2218, 2224 n. 12, 81 L.Ed.2d 42 (1984) ("[A]n administrative agency may not apply a new rule retroactively when to do so would unduly intrude upon reasonable reliance interests.").
 
 
 22
 Accordingly, OHA's application of the 1992 rule against Goodyear has a "retroactive effect" only if that application impaired Goodyear's vested rights, increased its liability, or imposed on it new duties with respect to its past conduct. See Landgraf, 511 U.S. at 280, 114 S.Ct. at 1505. In evaluating whether these indicators of retroactivity exist, we must consider the nature of the 1992 rule, the extent to which that rule altered the presumption of eligibility, and Goodyear's actions in reliance on having its refund claim evaluated under the prior rule. Id., at 269-70, 114 S.Ct. at 1499-1500.
 
 
 23
 The nature of the 1992 rule and the changes it instituted in OHA practice indicate that OHA's application of the rule in this case was not unlawful. The statute under which OHA promulgated the 1992 rule, PODRA, 15 U.S.C. § 4501-07 (1986), requires that OHA identify "persons injured by any actual or alleged violation of the petroleum pricing and allocation regulations issued pursuant to [EPAA] or [ESA]," establish the amount of that injury, and make restitution to the injured parties. 15 U.S.C. § 4502(b)(1) (1986). Aside from noting that crude oil refund proceedings must be conducted "in accordance with sub-part V regulations," 10 C.F.R. §§ 205.280-205.288 (1996), the statute is silent regarding how OHA is to identify injured parties or establish the amount of injury. Therefore, Congress left to OHA the task of determining what procedures and evidentiary devices would best serve the goals of the statute.
 
 
 24
 As Goodyear accurately points out, OHA initially afforded end user applicants the presumption that purchases of "any product that was regulated by DOE" from August 1973 through January 1981 qualified for crude oil refunds. Hartsville Oil Mill, 17 DOE (CCH) p 85,110, at 88,237 (1988). This presumption was designed to ease the burden on an applicant who was required under the statute to demonstrate that it was injured by an unlawful overcharge. Id. However, OHA soon came to believe that this presumption, if treated as unrebuttable, would result in refunds based on products that were not in fact subject to price controls when purchased. See Montana Sulfur & Chem. Co., 20 DOE (CCH) p 85,625, at 89,417 (1990). In essence, OHA realized that its procedures for identifying qualified applicants did not implement the statute; they were defective. As DOE points out, the Hartsville presumption, applied rigidly, would have compelled OHA to grant crude oil refunds for products that had actually been produced in petrochemical plants, contrary to the unambiguous language and clear mandate of PODRA.
 
 
 25
 Thus, in an effort to better serve the purposes of that statute, OHA reevaluated the evidentiary presumption. Through a rulemaking process in which Goodyear participated, OHA rationally devised the 1992 rule and thoroughly justified its departure from the old presumptions. See SEC v. Chenery Corp., 332 U.S. 194, 203, 67 S.Ct. 1575, 1580-81, 91 L.Ed. 1995 (1946) ("[T]he choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency."). Under the new rule, OHA afforded the presumption to products (1) covered in regulations promulgated pursuant to EPAA (but not ESA), or (2)(a) purchased from crude oil refineries or (b) originating in a crude oil refinery and purchased from a reseller who did not substantially alter its form. 57 Fed.Reg. at 30,732. OHA expanded the conditions under which it would afford the presumption in some ways and narrowed them in others. OHA did this, in accord with its statutory mandate, to better determine in the context of its own refund application proceedings which applicants were actually injured by unlawful overcharges. Id.
 
 
 26
 OHA's 1992 rule was a permissible and desirable correction of a practice that it determined to be inconsistent with its mandate. See FCC v. Nat'l Citizens Comm. for Broad., 436 U.S. 775, 796-97, 98 S.Ct. 2096, 2112-13, 56 L.Ed.2d 697 (1978); see also Rainbow Broad. Co. v. FCC, 949 F.2d 405, 409 (D.C.Cir.1991) ("According agencies the power to change their minds about their own policies, practices and procedures rests on a sound policy basis."). When viewed in light of its statutory mandate, OHA's application of the 1992 rule to earlier-filed, but still-outstanding, claims such as Goodyear's was not unlawful. The changes brought about by the 1992 rule did not transform qualified applicants into unqualified applicants. Rather, those changes properly treated applicants who may not have suffered the injuries contemplated by the statute (who improvidently would have received refunds under the liberal presumptions of OHA's prior rule) as unqualified absent explicit proof of a crude oil overcharge injury. The 1992 rule thus repaired a defective practice, one inconsistent with the statutory mandate. See Chenery, 332 U.S. at 203, 67 S.Ct. at 1580-81 (The Court balanced retroactivity "against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles. If that mischief is greater than the ill effect of the retroactive application of the new standard, it is not ... condemned by law.").
 
 
 27
 An important factor in the determination that application of the 1992 rule was not unlawfully retroactive is that it did not affect Goodyear's primary conduct, its initial purchase of the petroleum products. As the Supreme Court stated in Landgraf:
 
 
 28
 Changes in procedural rules may often be applied in suits arising before their enactment without raising concerns about retroactivity.... Because rules of procedure regulate secondary rather than primary conduct, the fact that a new procedural rule was instituted after the conduct giving rise to the suit does not make application of the rule at trial retroactive.
 
 
 29
 511 U.S. at 275, 114 S.Ct. at 1502 (discussing Ex parte Collett, 337 U.S. 55, 69 S.Ct. 944, 93 L.Ed. 1207 (1949)). Goodyear readily admits that its primary conduct, viz., its original decision concerning how and from whom to purchase the petroleum products, was not affected by OHA's presumptions. The 1992 rule and its predecessors affected only Goodyear's secondary conduct, the manner in which it must prove that it suffered an overcharge injury. Thus, consistent with Landgraf, OHA's application of the 1992 rule to Goodyear's claim was not unlawfully retroactive because it did not impose any new duties or liabilities relating to Goodyear's primary conduct. Goodyear did not detrimentally rely, nor could it have, on the pre-1992 rules and their relaxed evidentiary presumptions when it initially purchased the petroleum products.
 
 
 30
 Similarly, Goodyear did not have any vested right to receive a refund or have its application adjudicated in light of any particular evidentiary presumptions. As the district court stated, Goodyear was "simply an applicant for a crude oil overcharge" whose refund claims had not yet been approved. 942 F.Supp. at 633. Rights vest only on the basis of statutory entitlement, not changeable procedural presumptions.
 
 
 31
 Goodyear also argues that the Supreme Court's opinion in Greene v. United States, 376 U.S. 149, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964), supports a determination that OHA's application of the 1992 rule was retroactive. We are not persuaded by Goodyear's argument because Greene is distinguishable. That case involved a party's right to compensation that had clearly vested and the government's attempt to avoid liability for its prior unlawful action. Id. at 160-62, 84 S.Ct. at 621-23. Goodyear's case, on the contrary, involves a right that had not vested and the government's effort to fairly and equitably administer the distribution of a public fund.
 
 
 32
 We therefore conclude, as did the district court, that OHA's application of the 1992 rule to Goodyear's outstanding refund claims was not unlawfully retroactive. The application of the 1992 rule did not impair any vested right that Goodyear possessed when it first filed its refund claim; it did not increase Goodyear's liability for any past conduct or impose any new duties on Goodyear with respect to completed transactions.B. Application Of The 1992 Rule
 
 
 33
 Goodyear also argues that even if the 1992 rule was lawfully applied to its refund claims, OHA misapplied that rule in determining that each of the identified products is not presumed to be eligible. Goodyear first contends that its purchases of propylene, isoprene, butadiene, and petroleum wax meet subparagraph (1) of the 1992 rule because each was in fact "named as a covered product in regulations promulgated pursuant to the EPAA." 57 Fed.Reg. at 30,732. According to Goodyear, because Congress explicitly intended that CLC's SICM-based "Phase IV" petroleum price regulations would serve as the regulation under the EPAA until they were amended, see 15 U.S.C. § 755(a) (1974), OHA should have considered the SICM-based regulations to have been "promulgated pursuant to the EPAA."
 
 
 34
 We reject Goodyear's argument because OHA's interpretation of its own rule is reasonable and entitled to deference. In determining whether to uphold an agency's application and interpretation of its own rules promulgated pursuant to Congressional authorization, we are guided by the following principles: "[W]here Congress has authorized an agency to promulgate substantive rules under a statute it is charged with administering, we must uphold the agency's interpretation of an ambiguity or omission in that statute if the interpretation is a reasonable one." Merck & Co., Inc. v. Kessler, 80 F.3d 1543, 1549 (Fed.Cir.1996) (citing Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-45, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984)). Furthermore, "it is well established that 'an agency's construction of its own regulations is entitled to substantial deference.' " Martin v. Occupational Safety and Health Review Comm'n, 499 U.S. 144, 150, 111 S.Ct. 1171, 1175, 113 L.Ed.2d 117 (1991) (quoting Lyng v. Payne, 476 U.S. 926, 939, 106 S.Ct. 2333, 2341-42, 90 L.Ed.2d 921 (1986)). Therefore, we will "give effect to the agency's interpretation [of its own regulations] so long as it is 'reasonable,' that is, so long as the interpretation 'sensibly conforms to the purpose and wording of the regulations.' " Id. at 150-51, 111 S.Ct. at 1176 (quoting Northern Indiana Pub. Serv. Co. v. Porter County Chapter of Izaak Walton League of Am., Inc., 423 U.S. 12, 15, 96 S.Ct. 172, 173-74, 46 L.Ed.2d 156 (1975)) (citation omitted). "This broad deference is all the more warranted when, as here, the regulation concerns 'a complex and highly technical regulatory program,' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.' " Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512, 114 S.Ct. 2381, 2387, 129 L.Ed.2d 405 (1994) (quoting Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 697, 111 S.Ct. 2524, 2534, 115 L.Ed.2d 604 (1991)).
 
 
 35
 As explained above, the 1992 rule was part of a reasonable OHA effort to tailor its administration of PODRA to the statutory mandate by means of a procedure not explicitly addressed by Congress. The 1992 rule plainly refers only to "regulations enacted pursuant to EPAA," not those enacted pursuant to ESA, but given effect under EPAA. To construe the 1992 rule as Goodyear suggests would eviscerate OHA's efforts to more narrowly tailor its eligibility presumptions in order to administer PODRA properly. Accordingly, we reject Goodyear's argument that the 1992 rule's language "named as a covered product in regulations promulgated pursuant to the EPAA" is a reference to the SICM-based regulations promulgated under the ESA.
 
 
 36
 Goodyear next argues that OHA improperly failed to afford it the benefit of a presumption that its suppliers passed on crude oil overcharges in the form of inflated prices for non-EPAA petroleum products. Goodyear argues that the fact that it purchased each of the identified petroleum products from petroleum company affiliates should be sufficient in and of itself to support a presumption that Goodyear bore the brunt of the overcharges on those products.
 
 
 37
 We do not agree with Goodyear because the presumption that it advocates does not exist. The 1992 rule only provides for specifically-delineated presumptions, and that which Goodyear seeks is not provided for by the rule. Goodyear's argument is merely an attempt to avoid the fact-intensive, case-bycase proof mandated by the 1992 rule for refund applications based on its purchases of non-EPAA products. To qualify for a refund based on such purchases, an applicant must demonstrate by means of a reasoned argument supported by reliable, probative evidence that it qualifies for a specific presumption of overcharge injury.
 
 
 38
 Moreover, as the district court noted, creating the presumption suggested by Goodyear would permit suppliers affiliated with the petroleum industry who passed on only part of the overcharge to recover refunds based on evidence of injury from the overcharges that it did not pass on, while also allowing ultimate purchasers such as Goodyear, benefiting from a presumption, to recover refunds in the absence of evidence of injury. Such double recovery would be inconsistent with PODRA. Therefore, because OHA's interpretation of its own rule is reasonable, we defer to that interpretation. We conclude that OHA properly rejected Goodyear's argument seeking to create a new presumption.
 
 
 39
 Finally, Goodyear argues that OHA erred by failing to afford it the presumption of injury under subparagraph (2)(a) of the 1992 rule. Goodyear argues that it offered reliable, probative evidence that its purchases of propylene, isoprene, butadiene, and petroleum wax were from a crude oil refinery. Specifically, Goodyear argues that OHA arbitrarily disregarded the affidavits of Burt Bishop, a chemist employed by Goodyear for sixteen years who was familiar with the operations of Goodyear's major suppliers of petroleum products. In his first affidavit, Bishop stated generally that the above-listed petroleum products purchased by Goodyear were typically produced in petrochemical plants that were "physically integrated with the crude oil refinery operations." In a supplemental affidavit submitted in response to OHA's request for further details to confirm his first affidavit, Bishop discussed only the production of propylene and butadiene. He stated, based on telephone conversations with Goodyear's suppliers of propylene and butadiene, that for all of Goodyear's suppliers except for one[2] "the ethylene cracker and related equipment used to produce butadiene and/or propylene were physically integrated with crude oil refinery operations." Thus, Goodyear argues that the statements in Bishop's affidavit, which should be given weight, entitle it to the presumption of overcharge injury for its purchases of the four above-listed products or, at the very least, for its purchases of butadiene and propylene.
 
 
 40
 DOE argues that OHA properly refused to presume that the petroleum products on which Goodyear's refund claims were based were purchased from crude oil refineries because Goodyear offered no probative evidence to that effect. DOE points out that OHA treated the Bishop affidavits as unreliable only after considering a series of ex parte telephone interviews conducted by OHA's Senior Attorney with Goodyear's propylene and butadiene suppliers. According to DOE, OHA properly considered these interviews, particularly the fact that two of Goodyear's four propylene suppliers and three of Goodyear's six butadiene suppliers contradicted Bishop by stating that they did not produce these compounds in crude oil refineries. DOE argues that, based on these statements, OHA properly determined that Bishop's affidavits were not probative evidence that any of the petroleum products were purchased from a crude oil refinery.
 
 
 41
 Goodyear challenges OHA's use of a staff attorney to make ex parte contacts to inquire as to the accuracy of Bishop's supplemental affidavit. We do not accept this challenge. Staff investigation of facts is not improper. See 5 U.S.C. § 554(d) (1994) (prohibiting only the agency decision-maker and his supervisors from engaging in ex parte contacts during the course of an adjudication). Similarly, we find no error in OHA's disregarding the general averments in Bishop's initial affidavit. As OHA noted, these averments did not constitute "specific evidence" to demonstrate that petroleum products were purchased from or originated in crude oil refineries. See, e.g., Goodyear, 24 DOE (CCH) p 85,039, at 88,119-20 (regarding isoprene); id. at 88,124 (regarding petroleum wax).
 
 
 42
 However, we agree with Goodyear that OHA erred by disregarding Bishop's specific averments in his supplemental affidavit concerning the production of propylene and butadiene by two of Goodyear's suppliers. These averments were confirmed and never contradicted by the comments solicited by OHA. According to the OHA Senior Attorney's notes, one supplier unambiguously stated that the "ethylene crackers" used by two of Goodyear's suppliers, unlike most ethylene crackers in use at the time, were part of a crude oil refinery. This evidence confirms Bishop's averments that these suppliers used ethylene crackers that were integrated with a crude oil refinery and supports the conclusion that the propylene and butadiene that Goodyear purchased from the two named suppliers were in fact purchased from and originated in a crude oil refinery. This evidence, which serves to corroborate rather than contradict Bishop's averments, was never addressed by OHA.
 
 
 43
 Instead, as DOE points out, OHA found that Bishop's specific averments were not persuasive because they were contradicted by the other suppliers and one of the two named suppliers. While several of the other suppliers did indicate that their own propylene and butadiene production facilities were not part of crude oil refineries, they did not indicate that the same was true for the facilities of the two named suppliers. As noted above, the only comments pertaining to these two suppliers actually confirmed Bishop's averments. Accordingly, the statements of the other suppliers are not relevant to Bishop's specific statements regarding the two named suppliers. Therefore, OHA erred to the extent that it relied on these other statements.
 
 
 44
 Similarly, neither of the named suppliers contradicted Bishop. One named supplier was either never contacted or refused to respond to OHA's request for comments. The other named supplier did respond to OHA's request for comments, but merely noted that (1) the superintendent of its chemical division rather than of its crude oil division oversaw the production of propylene and butadiene and (2) the name of its chemical division rather than its crude oil division appeared on sales invoices for propylene and butadiene. While OHA's apparently relied on these statements to support its finding that propylene and butadiene from this supplier were not purchased from a crude oil refinery, these statements do not support such a finding. At most, they indicate that this supplier favored particular methods of bookkeeping and managerial oversight. Such superficial observations are not substantial evidence regarding the nature of the production facility, especially in light of Bishop's affidavit, which was confirmed by an uninterested party.
 
 
 45
 We therefore conclude that the specific averments in Bishop's supplemental affidavit, when read together with the statement confirming them, constitute probative evidence that the purchases of propylene and butadiene from two of Goodyear's suppliers were from crude oil refineries. Goodyear demonstrated that these purchases qualify for the presumption of overcharge under the 1992 rule. See 57 Fed.Reg. at 30,732 ("We will presume that a claimant incurred a crude oil overcharge in the purchase of a product during the relevant period if ... that product ... (a) was purchased from a crude oil refinery...."). Because only irrelevant, insubstantial evidence supports OHA's contrary findings, those findings must be reversed.
 
 CONCLUSION
 
 46
 The district court did not err in concluding that OHA's application of the 1992 rule to Goodyear's refund claims was not unlawfully retroactive. Likewise, the district court did not err in concluding that OHA properly declined to apply a broad, non-specific presumption of overcharge injury to Goodyear's refund claim. The district also did not err in concluding that substantial evidence supported OHA's denying a presumption of overcharge injury with respect to the majority of Goodyear's purchases. However, the district court did err in concluding that substantial evidence supported OHA's denial of Goodyear's refund claims based on the purchases of two petroleum products (propylene and butadiene) from two of its suppliers. The evidence of record indicates that these purchases were from crude oil refineries and thus were entitled to a presumption of overcharge injury.
 
 
 47
 AFFIRMED-IN-PART and REVERSED-IN-PART.
 
 
 
 [1]
 For a more detailed discussion of the regulatory framework of the EPAA and ESA, see Phoenix Petroleum Co. v. FERC, 95 F.3d 1555, 1559-63 (Fed.Cir.1996)
 
 
 [2]
 Goodyear has considered the identity of its suppliers to be confidential. The suppliers are therefore not identified by name in the publicly-available version of this opinion. A version of the opinion in which the suppliers are identified by name will be issued under seal to the parties